AUSA: John K. Neal    W. I.    Telephone: (313) 226-9644

Special Agent    : Marc L. Heggemeyer    Telephone: (313) 226-4108

AO 91 (Rev. 08/09) Criminal Complaint



# UNITED STATES DISTRICT COURT
### for the
### Eastern District of Michigan

**ORIGINAL**

United States of America,

         Plaintiff,

v.

DR. GAVIN IRA AWERBUCH

|  |
|---|
| Case: 2:14-mj-30216 |
| Judge: Unassigned, |
| Filed: 05-02-2014 At 03:08 PM |
| USA v. Sealed Matter(cmp)(mlw) |

         Defendant(s).

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief:

On or about the date(s) of <u>January, 2009 through the present</u>, in the county of <u>Saginaw</u> in the <u>Eastern</u> District of <u>Michigan</u>, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. Section 1347 | Health Care Fraud |
| 21 U.S.C. Section 841(a)(1) | Distribution of Controlled Substances |

This criminal complaint is based on these facts:

☑ Continued on the attached sheet.

                           *Complainant's signature*

                  Marc L. Heggemeyer, Special Agent HHS-OIG
                       *Printed name and title*

Sworn to before me and signed in my presence.

Date: <u>May 2, 2014</u>

                           *Judge's signature*

City and state: <u>Detroit, Michigan</u>

                       Mona K. Majzoub, United States Magistrate Judge
                       *Printed name and title*

## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

### I.  Affiant's Background and Qualifications

1. I, Marc L. Heggemeyer, hereinafter referred to as the Affiant, am a Special
   Agent employed by the United States Department of Health and Human
   Services (HHS), Office of Inspector General (OIG), Office of Investigations
   (OI).  I have been so employed since July 2010.  I am an investigative or law
   enforcement officer of the United States within the meaning of Section 2510
   (7) of Title 18, United States Code, in that I am empowered by law to conduct
   investigations and to make arrests for federal felony offenses.

2. The Drug Enforcement Administration (DEA), Federal Bureau of Investigation
   (FBI), Internal Revenue Service (IRS) and Health and Human Services, Office
   of the Inspector General (HHS-OIG), are currently conducting an investigation
   of Dr. Gavin Ira Awerbuch (Dr. Awerbuch), DEA Registration number
   BA1385764, and his business Gavin Awerbuch, M.D. PLLC, which operates at
   5889 Bay Road, Suite 104, Saginaw, MI 48604, for violations including Health
   Care Fraud, in violation of Title 18 United States Code, Section 1347, and
   Distribution of Controlled Substances, in violation of  Title 21 United States
   Code Section 841.

3. As part of my duties, I am authorized to conduct investigations, audits and
   inspections in connection with the administration and enforcement of laws,
   regulations, orders, contracts and programs in which HHS is, or may be, a
   party of interest, and perform other duties on behalf of the Secretary of HHS.
   My chief responsibility is the investigation of fraud involving federally-funded
   health care programs.  As a Special Agent with HHS-OIG, I have received

basic criminal investigator training as well as specialized training in the investigation of fraud and financial crime. Previously, I was employed as a Medicare Fraud Analyst and Health Care Fraud Investigator for government-funded Medicare/Medicaid contractors as well as a Criminal Investigator with the Maryland Attorney General's Office, Medicaid Fraud Control Unit for approximately 25 months. Overall, I have spent the last ten years investigating health care fraud against the federally-funded health care programs commonly known as Medicare and Medicaid.

4. I have knowledge of the facts set forth in this Affidavit as a result of my participation in the investigation, as well as information provided to me by other law enforcement agents. Information pertinent to this investigation was also provided by TrustSolutions, LLC (T.S.) and Cahaba Safeguard Administrators, LLC (Cahaba), and Health Integrity, LLC (Health Integrity), private entities which contract with HHS to perform investigations and audits designed to protect the Medicare program from waste, fraud, and abuse. Because this Affidavit is being submitted for the limited purpose of supporting a criminal complaint, I have not included each and every fact known to me concerning this investigation.

5. Based upon the information set forth below, I have reason to believe and do respectfully submit there is probable cause to believe that Dr. Awerbuch has violated 18 U.S.C. § 1347 (Health Care Fraud) and 21 U.S.C. § 841 (Controlled Substance Distribution).

## I.    The Health Care Benefit Programs

6. The Medicare Program (Medicare) is a federally-funded health care program providing benefits to persons who are over the age of sixty-five or disabled and was established by Congress in 1965, as Title 18 of the Social Security Act and codified at Title 42, United States Code, Section 1395. The Medicare program is administered through the Centers for Medicare and Medicaid Services (CMS), formerly the Health Care Financing Administration (HCFA). The CMS is a division of the Department of Health and Human Services (HHS) of the United States Government.

7. Medicare is a "health care benefit program," as defined by Title 18, United States Code, Section 24(b).

8. Medicare has four parts: hospital insurance (Part A), medical insurance (Part B), Medicare Advantage (Part C), and prescription drug benefits (Part D). Medicare Part B helps pay the cost of physician services, medical equipment and supplies, and other health services and supplies not paid by Part A.

9. Part B of the Medicare program provides supplemental medical insurance for physician services, laboratory services, durable medical equipment (DME), outpatient hospital services and other medical services.

10. Part D of the Medicare program subsidizes the costs of prescription drugs for Medicare beneficiaries in the United States. It was enacted as part of the Medicare Prescription Drug, Improvement and Modernization Act of 2003 and went into effect on January 1, 2006. Part D benefits are administered by private insurance plans that are reimbursed by Medicare through CMS.

11.Blue Cross Blue Shield of Michigan (BCBSM) is the largest independent
   licensee of Blue Cross Blue Shield Association, which is a federation of thirty-
   nine separate health insurance organizations and companies in the United
   States. BCBSM is a nonprofit organization providing and administering health
   benefits to more than 4.3 million members residing in Michigan. BCBSM is a
   health care benefit program as defined by Title 18, United States Code, Section
   24(b).  BCBSM provides health insurance coverage for, among other things,
   physician services and prescription drugs in many of the plans it administers.

## II.    Controlled Substances

12.The Drug Enforcement Administration, pursuant to its regulatory authority, has
   determined that certain prescription medications are controlled based on their
   potential for addiction and abuse.  The U.S. Drug Enforcement Administration
   assigns Schedules to these prescription medications according to their potential
   for abuse and addiction, with a controlled substance in Schedule II having the
   highest potential for addiction and abuse.  Prescription drugs which are
   controlled are assigned to Schedules II, III, IV or V.

   a) Oxycontin (Oxycodone) is a Schedule II controlled substance, as defined in
      21. U.S.C. Section 812 and 21 C.F.R 1308.12 (b)(1). Fentanyl is likewise a
      Schedule II controlled substance, as defined in the same statute and in 21
      C.F.R. 1308.12(c)(9).

   b) Vicodin (hydrocodone), is a Schedule III controlled substance, as defined in
      21 U.S.C. Section 812 and 21 C.F.R. 1308.13.

13. 21 U.S.C.§ 830 (b) (3)(A) (ii) defines a valid prescription as a prescription which is issued for a legitimate medical purpose, by an individual practitioner licensed by law to administer and prescribe the subject drugs, who is acting in the usual course of the practitioner's professional practice in issuing the prescription. 21 U.S.C. §842 (a) (1) states that it is unlawful for any person who is subject to the requirements of licensure to distribute or dispense a controlled substance in violation of section 829 of that title.

14. 21 C.F.R. (Code of Federal Regulations), § 1306.04 (a) states that a prescription for a controlled substance to be effective must be issued for a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice.

15. A combination of federal statutes and regulations control the lawful dispensing or distribution of Schedule II through V controlled substances. The Sixth Circuit, along with other courts, has held that it is unlawful for a practitioner to distribute a Schedule II-V controlled substance if the doctor or pharmacist is not acting within the usual course of professional practice, pursuant to 21 U.S.C. § 841. *See, e.g., United States v. Johnson*, 71 F.3d 539, 542 (6th Cir. 1995), cert. denied, 517 U.S. 1113 (1996).

### III.   Investigation

16. Your Affiant is assigned to the investigation of Gavin Awerbuch, M.D. and his medical practice, which is incorporated as Gavin Awerbuch MD PLLC. Based upon statements obtained by the DEA, HHS-OIG, and the FBI, and a review of Medicare billing records, there is probable cause to believe that Dr. Awerbuch is writing and has written prescriptions for controlled substances outside the

usual course of professional practice. There is also probable cause to believe that Dr. Awerbuch, by writing such prescriptions outside the course of legitimate medical practice, has caused the submission of false claims to Medicare and to private insurers.

17. In addition, there is probable cause to believe that Dr. Awerbuch has billed and is billing Medicare and other insurers for certain diagnostic procedures, specifically nerve conduction studies (NCS) and needle electromyographies (EMGs), which were not actually provided as billed. Dr. Awerbuch has obtained over $5 million for such procedures in the last five years.

## IV.   Subsys

18. Subsys is manufactured by DPT Laboratories, Inc. for Insys Therapeutics, Inc., a pharmaceutical company headquartered in Phoenix, Arizona. In a March, 2014 annual report filing with the Securities and Exchange Commission, Insys described its activities as follows:

- We are a commercial-stage specialty pharmaceutical company that develops and commercializes innovative supportive care products. We have two marketed products: Subsys, a proprietary sublingual fentanyl spray for breakthrough cancer pain, or BTCP, in opioid-tolerant patients and Dronabinol SG Capsule, a generic equivalent to Marinol (dronabinol), an approved second-line treatment an approved second-line treatment of chemotherapy-induced nausea and vomiting, or CINV, and anorexia associated with weight loss in patients with AIDS. We market Subsys through an incentive-based sales model.

19. Subsys is a delivery mechanism for liquid fentanyl formulations. Fentanyl is a Schedule II controlled substance.

20. Insys Therapeutics' website "Highlights of Prescribing Information," reports indication for Subsys as follows:

    a) Subsys is an opioid agonist indicated for the management of breakthrough pain in cancer patients 18 years of age and older who are already receiving and who are tolerant to opioid therapy for their underlying persistent cancer pain. Patients must remain on around-the-clock opioids when taking Subsys.

21. Because of the risk for misuse, abuse, addiction, and overdose, the Food and Drug Administration (FDA) provides that Subsys, among certain other fentanyl medications, is available only through a program called Risk Evaluation and Mitigation Strategy (REMS) for medications classified as Transmucosal Immediate-Release Fentanyl (TIRF).

22. Prescribers wishing to prescribe TIRF medications, such as Subsys, are required to enroll in the TIRF-REMS program. To enroll in this program, among other things, providers are required to sign documentation stating:

    • (2) I understand that TIRF medicines can be abused and that this risk should be considered when prescribing or dispensing TIRF medicines in situations where I am concerned about an increased risk of misuse, abuse, or overdose, whether accidental or intentional."

    • (3) I understand that TIRF medicines are indicated only for the management of breakthrough pain in patients with cancer, who are

already receiving and who are tolerant to around-the-clock therapy for their underlying persistent pain."

- (7) I understand that the initial starting dose for TIRF medicines for all patients is the lowest dose, unless individual product labels provide product-specific conversion recommendations, and I understand that patients must titrated individually."

- (9) I will complete and sign a TIRF REMS Access Patient-Prescriber Agreement Form with each new patient, before writing patient's first prescription for a TIRF medicine, and renew the agreement every two (2) years."

- (10) I will provide a completed, signed copy of the Patient-Prescriber Agreement Form to the patient and retain a copy for my records. I will also provide a completed, signed copy to the TIRF REMS Access program.

- (11) At all follow-up visits, I agree to assess the patient for appropriateness of the dose of the TIRF medicine, and for signs of misuse and abuse.

## V.     Medical Coding

23. The American Medical Association assigns and publishes numeric codes, known as the Current Procedural Terminology (CPT) and Health Care Procedure Common Coding System (HCPCS) codes. The codes are a systematic listing, or universal language, used to describe the procedures and services performed by health care providers.

24. The procedures and services represented by the CPT and HCPCS codes are health care benefits, items, and services within the meaning of 18 U.S.C. §

24(b). They include codes for office visits, diagnostic testing and evaluation, and other services. Health care providers use CPT and HCPCS codes to describe the services rendered in their claims for reimbursement to health care benefit programs.

25. Health care benefit programs, including Medicare, use these codes to understand and evaluate claims submitted by providers and to decide whether to issue or deny payment. Each health care benefit program establishes a fee or reimbursement level for each service described by a CPT or HCPCS code.

26. Health care providers often seek reimbursement from insurance carriers on forms known as CMS Form 1500. On the form, the provider identifies itself by Provider Identification Number (PIN) or Tax Identification Number (TIN), identifies the beneficiary who received the services, describes the illness or injury that makes the services medically necessary, and identifies the services provided by CPT and HCPCS codes. In response to each claim, the insurance carrier issues a payment or denial.

## VI.    Nerve Conduction Studies and Needle EMGs

27. Dr. Awerbuch is a prolific biller of two categories of diagnostic tests, referred to as nerve conduction studies (NCS) and needle electromyographies (EMGs). Broadly speaking, these diagnostic tests are used to detect damage to nerves and muscles, and to help pinpoint the causes of such damage. A nerve conduction study measures how quickly electrical impulses move along a nerve. A needle EMG measures the electrical activity of the muscle. These two diagnostic procedures are represented by the following CPT Codes:

| CPT | CPT DESCRIPTION |
|---|---|
| 95904 | Nerve conduction, amplitude and latency/velocity study, each nerve; sensory |
| 95903 | Nerve conduction, amplitude and latency/velocity study, each nerve; motor, with f-wave study |
| 95861 | Needle measurement and recording of electrical activity of muscles of arms or legs |
| 95864 | Needle measurement and recording of electrical activity of muscles in arms or legs |
| 95885 | Needle measurement and recording of electrical activity of muscles of arm or leg limited study |
| 95886 | Needle measurement and recording of electrical activity of muscles of arm or leg complete study |
| 95887 | Needle measurement and recording of electrical activity of head or trunk muscles |

28. Dr. Awerbuch used each of the above codes to bill Medicare and other insurers for nerve conduction studies and needle EMGs he purportedly performed. The procedure for a nerve conduction study, as verified by a consulting neurologist, is as follows:

  a. Before the NCS, patients are typically referred to specialists. The patient is advised not to shave and/or apply any skin lotions to the areas to be tested. The patient is also advised to let the specialist know of any medications they are taking, especially blood thinners.

  b. Nerve Conduction Study. To begin, the examiner places flat surface electrodes to the patient's skin. The electrodes are placed at measured intervals over the nerve that is being examined. The examiner then uses a hand-held stimulator to deliver a low-intensity electric current to the skin near the nerve being tested. In most cases, a series of small shocks are

necessary to get the optimal response. These shocks may cause the patient some discomfort. The examiner administers several electrical pulses to the patient's skin, and the electrical signals produced by the nerves and muscles are recorded by a computer. Several different motor and sensory nerves are typically evaluated, and the same nerves on both sides of the body may be studied for comparison. When the test is finished, the examiner removes the electrodes. Nerve conduction studies are typically done before a needle EMG if both tests are being performed at the same visit. Nerve conduction studies typically take from 15 minutes to more than one hour.

29. The procedure for a needle EMG, as verified by a consulting neurologist, is as follows:

   a. As with NCS procedures, patients needing needle EMGs are generally referred to specialists qualified to administer and interpret such tests. The patient is advised not to shave and/or apply any skin lotions to the areas to be tested. The patient is also advised to let the specialist know of any medications they are taking, especially blood thinners.

   b. Needle EMG. A needle EMG is performed by first cleaning the skin over the areas to be tested. Next, the examiner inserts a needle electrode, attached by wires to a recording machine, through the skin into a muscle. This injection may cause the patient some discomfort, as the needle penetrates both the skin and the muscle. Once the needle electrode is in place, the electrical activity in that muscle is first recorded while the muscle is at rest. Then, the examiner asks the patient to tighten (contract) the muscle slowly and steadily, with gradually increasing force, while the electrical activity is being recorded. The needle electrode may be moved a number of times to record the activity in different areas of the muscle or

in different muscles. The electrical activity in the muscle is shown by oscillating or waveform lines on a video monitor, and may also be heard on a loudspeaker as popping sounds when the patient contracts the muscle. The electrical activity is recorded on a computer and may also be recorded on video. When the test is finished, the needle electrode is removed and the injection sites are cleaned. The patient may be given pain medicine if any of the test areas or injection sites is sore or bruised. A needle EMG typically takes from 25 to 60 minutes.

## VII. Gavin Awerbuch, MD PLLC

### A. Background

30. Gavin Ira Awerbuch (Dr. Awerbuch) incorporated Gavin Awerbuch, M.D. PLLC on or about May 14, 2008. The corporate records identify Dr. Awerbuch as the owner of Gavin Awerbuch, M.D. PLLC. Records from the State of Michigan, Department of Licensing and Regulatory Affairs show that Dr. Awerbuch possesses a Medical Doctor License, license number 4301405226, which became effective on or about September 23, 1987 and expires on January 31, 2015.

31. Dr. Awerbuch was certified as a Medicare provider and issued the provider identification number (PIN) OO91308 which became effective on or about September 23, 1987.

32. For dates of service in or about January 2009 through January 2014, Awerbuch submitted approximately 42,780 claims to Medicare for 2,437 Medicare beneficiaries totaling approximately $31,521,413.91, of which Medicare paid approximately $9,816,532.39.

33. In addition to his personal claims to Medicare, Medicare Part D has paid approximately $6,969,100 for dates of service January 1, 2009 through February 6, 2014 for Subsys prescribed by Dr. Awerbuch, making Dr. Awerbuch far and away the top prescriber of Subsys for Medicare beneficiaries nationwide in this time frame. Dr. Awerbuch wrote approximately 1,283 prescriptions for Subsys for Medicare beneficiaries during this period. This is more than six times the number of Subsys prescriptions for Medicare beneficiaries written by his next closest prescriber, who wrote approximately 203 such prescriptions.

34. The below table illustrates the billed and paid amounts from Medicare and BCBSM to Dr. Awerbuch as they relate to the procedure codes at issue in the investigation:

| CPT | MEDICARE PIN 0091308 (JAN 09 to JAN 14) | | BCBS (JAN 09 0 MAR 14) | |
| --- | --- | --- | --- | --- |
| | BILLED | PAID | BILLED | PAID |
| 95904 | $3,811,125.00 | $1,316,694.27 | $4,278,917.00 | $1,224,573.34 |
| 95903 | $2,071,479.00 | $932,612.73 | $2,904,213.00 | $1,072,798.40 |
| 95861 | $1,475,160.00 | $351,697.08 | $1,379,695.00 | $252,052.93 |
| 95864 | $535,120.00 | $139,851.19 | $560,630.00 | $126,585.19 |
| 95885 | $30,452.00 | $4,422.62 | $25,900.00 | $1,231.89 |
| 95886 | $949,136.40 | $209,117.43 | $579,250.00 | $34,916.30 |
| 95887 | $300.00 | $58.62 | $0.00 | $0.00 |
| | $8,872,772.40 | $2,954,453.94 | $9,728,605.00 | $2,712,158.05 |

35. As set forth below, the facts developed to date indicate that Dr. Awerbuch is prescribing Subsys outside the scope of legitimate medical practice and for no legitimate medical purpose. Furthermore, there is probable cause to believe that Dr. Awerbuch is billing Medicare and BCBSM for NCS and EMGs which he is not actually providing. Given the evidence developed from undercover patient visits, beneficiary interviews, expert witness reviews, and the total monies

received from Medicare and other insurers for these medications and services, there is also probable cause to believe that Dr. Awerbuch's illegal conduct is extensive and pervasive.

## VIII.  Facts Supporting Allegations

### A.  Undercover Visits
### April 19, 2011

36. Lansing Police Officers UC1 and UC2 went to see Dr. Awerbuch for the purpose of obtaining a needle EMG with Dr. Awerbuch.  UC2 observed and videotaped the EMG machine with a hanging needle and a printer cable that was not plugged in to the back of the machine. Dr. Awerbuch did not handle the machine prior to the testing.  There was no data pre-loaded into the machine (Name, DOB, etc.) The needle that was hanging from the wire on the machine was not sterilized prior to the testing, nor was the skin on UC1's feet or legs cleansed or wiped down prior to the testing.

37. Dr. Awerbuch stated that the test involved a shock, but that he would turn the power down.  UC1 never witnessed Dr. Awerbuch handle the machine after informing UC1 of this.  Dr. Awerbuch then touched UC1s left and right leg and foot several times with a pronged instrument and an additional wire.  UC1 felt no pain or electricity during the portion of the test.  UC1 felt nothing but the pressure of the two instruments touching his/her skin.  UC1 told Dr. Awerbuch that he/she felt pain when Awerbuch pressed the right side of UC1's foot. When this happened, Dr. Awerbuch seemed surprised.

38. Dr. Awerbuch then took the needle that was hanging from a white wire on the machine and pressed it repeatedly against the skin on the left and right leg and foot, asking UC1 if he/she could feel him pressing the needle against the skin.

He also pressed the needle on UC1 several times in the lower back with the same needle. At no time during the test did the needle ever puncture UC1's skin, draw blood, cause visible injury or become embedded or inserted into his/her skin. The entire test, which UC2 surreptitiously audio and videotaped took approximately two and a half minutes in duration.

39. At the conclusion of the test, Dr. Awerbuch informed UC1 that the test was designed to test for a pinched nerve, and that UC1 had passed it, as he/she had no pinched nerve. Dr. Awerbuch wrote three prescriptions and referred UC1 back to his primary care physician, as the problem with his/her foot was not neurological and he could no nothing else for UC1 in the future.

    a. BCBSM data identified Dr. Awerbuch was paid a total of $1,191.81 for the following procedures billed for services provided to UC1:

| DOS | CPT | CPT DESCRIPTION | PAID |
|-----|-----|----------------|------|
| 4/19/2011 | 95861 | Needle measurement and recording of electrical activity of muscles of arms or legs | $ 168.38 |
| 4/19/2011 | 95903 | Nerve conduction, amplitude and latency/velocity study, each nerve; motor, with f-wave study | $ 354.92 |
| 4/19/2011 | 95904 | Nerve conduction, amplitude and latency/velocity study, each nerve; sensory | $ 402.32 |
| 4/19/2011 | 95934 | H-Reflex Test | $ 105.36 |
| 4/19/2011 | 99204 | Office Outpatient Visit, New Patient | $ 160.83 |

## July 29, 2011

40. Lansing Police Officers UC3 and UC4 went to Dr. Awerbuch's for an office visit. UC4 videotaped the appointment. UC3 informed Dr. Awerbuch that he/she "messed up" his/her back. Dr. Awerbuch asked detailed information about the injury. Dr. Awerbuch took UC3's blood pressure and informed him/her it was high.

41. Dr. Awerbuch performed a physical assessment on UC3 and asked him/her to
    sit down. Dr. Awerbuch took a needle and started to use it on UC3 immediately.
    UC4 commented that the needle looks "scary". Dr. Awerbuch said that this was
    a "test to see if you have a pinched nerve." Dr. Awerbuch used a two-pronged
    device and pushed it on UC3's lower left back twice. Dr. Awerbuch then
    grabbed a small wire and advised that it will give a small shock, but not to
    worry because he won't turn it on high. Dr. Awerbuch placed the wire on the
    lower right leg and used the two-pronged device on the upper part of UC3's
    lower right leg. Dr. Awerbuch then put the devices away and said, "I'm going
    to use a small pin and check your muscles." He advised UC3 that he/she might
    feel a "small prick, but it shouldn't hurt." As he was performing the test on
    UC3, he had a conversation with UC4. The entire test took less than two
    minutes. Dr. Awerbuch advised UC3 he would need an MRI of his back and a
    sleep test. UC3 asked Dr. Awerbuch, "So what does the machine show?" Dr.
    Awerbuch told him it showed UC3 that he/she had a pinched nerve.

    a. BCBSM data identified Dr. Awerbuch was paid a total of $1,280.39 for
       the following procedures billed for services provided to UC3:

| DOS | CPT | CPT DESCRIPTION | PAID |
|---|---|---|---|
| 7/29/2011 | 95861 | Needle measurement and recording of electrical activity of muscles of arms or legs | $ 180.24 |
| 7/29/2011 | 95903 | Nerve conduction, amplitude and latency/velocity study, each nerve; motor, with f-wave study | $ 383.20 |
| 7/29/2011 | 95904 | Nerve conduction, amplitude and latency/velocity study, each nerve; sensory | $ 437.02 |
| 7/29/2011 | 95934 | H-Reflex Test | $ 116.26 |
| 7/29/2011 | 99204 | Office/Outpatient Visit, New Patient | $ 163.67 |

**December 6, 2011**

42. UC5 and UC6 went to Dr. Awerbuch. UC6 videotaped the incident. Dr. Awerbuch performed a physical exam on UC5 and took his/her blood pressure. Dr. Awerbuch opened up a package with a fresh acupuncture needle and touched it to various parts of UC5's body. UC5 described it feeling like the needle penetrated the skin, however, the needle was not connected to any kind of device. UC5 felt the needle prick the skin and cause pain, but it did not cause bleeding because it was a very thin needle.

43. Dr. Awerbuch touched an electric probing device with two prongs to various points of UC5's body. The device had a dial on it that allowed Dr. Awerbuch to control the strength of the current. The first time Dr. Awerbuch used it on UC5's arm, UC5 jumped due to the sensation of a strong electrical current. Dr. Awerbuch then dialed it down and touched other points on the body.

44. Dr. Awerbuch then used the opposite end of the device that had a small needle on it to touch UC5's skin. The needle did not penetrate UC5's skin and he/she did not experience any pain. Dr. Awerbuch touched several parts of UC5's body. This test appeared to be in conjunction with a device which Dr. Awerbuch called an "EMG". What UC5 believed to be electrical waves appeared on the monitor connected to the machine. The machine did not generate any kind of printout or reading. The "EMG" test was completed within two minutes.

   a. BCBSM data show that Dr. Awerbuch was paid a total of $1,068.33 for the following procedures billed for services provided to UC5:

| DOS | CPT | CPT DESCRIPTION | PAID |
|-----|-----|-----------------|------|
| 12/6/2011 | 95861 | Needle measurement and recording of electrical activity of muscles of arms or legs | $ 180.24 |
| 12/6/2011 | 95904 | Nerve conduction, amplitude and latency/velocity study, each nerve; sensory | $ 437.02 |
| 12/6/2011 | 95900 | Motor Nerve Conduction Test | $ 287.40 |

| 12/6/2011 | 99204 | Office/Outpatient Visit, New Patient | $ 163.67 |

**January 24, 2012**

45. UC5 returned to Dr. Awerbuch's office for a scheduled visit. UC5 removed his/her shoes and socks and rolled up his/her pant legs. Dr. Awerbuch took a thin needle attached by wire to an electronic machine and touched the needle against various parts of UC5's feet/legs. UC5 did not experience any type of pain during the procedure. Dr. Awerbuch utilized a device with metal prongs attached to a computer and touched various parts of UC5's lower legs which caused a very minor pain sensation due to electrical shock. UC5 inquired about the results of previous testing and was advised by Dr. Awerbuch that UC5 had a "slipped disc" or something of a similar nature. Dr. Awerbuch asked UC5 whether an MRI had been conducted yet and UC5 responded that he/she was waiting for Dr. Awerbuch's office to schedule it. Dr. Awerbuch informed UC5 he would order an MRI.  UC5 experiences no back pain or any symptoms consistent with a "slipped disc."

    a. BCBSM paid Dr. Awerbuch a total of $1,290.27 for the following procedures billed for services provided to UC5 on this date:

| DOS | CPT | CPT DESCRIPTION | PAID |
|-----|-----|----------------|------|
| 1/24/2012 | 95864 | Needle measurement and recording of electrical activity of muscles in arms or legs | $239.54 |
| 1/24/2012 | 95900 | Motor Nerve Conduction Test | $574.80 |
| 1/24/2012 | 95904 | Nerve conduction, amplitude and latency/velocity study, each nerve; sensory | $291.35 |
| 1/24/2012 | 95934 | H-Reflex Test | $116.26 |
| 1/24/2012 | 99213 | Office/Outpatient Visit, Est. Patient | $68.32 |
| | | TOTAL | $1,290.27 |

**September 13, 2012**

46. UC5 went back to Dr. Awerbuch's office for a scheduled visit, having previously completed an MRI at Awerbuch's request. UC5 informed Dr. Awerbuch that no one had provided him/her results of the MRI that had been performed. Dr. Awerbuch informed UC5 that UC5 had a herniated disk in the neck, slipped disc in the lower back, and a torn left shoulder rotator cuff. BCBSM had a physician review the MRI results for UC5, and the physician opined the results showed no definite rotator cuff tear, that the cervical spine showed minimal bulging of two lower cervical discs without significant neural encroachment, and lumber spine showed minimal bulging of L5-S1 disc without neural impingement. UC5 informed Dr. Awerbuch that he/she wanted Vicodin, a schedule III controlled substance, which he/she had received before from Dr. Awerbuch. Dr. Awerbuch agreed to prescribe Vicodin. UC5 placed $1,000 cash on the table in front of Dr. Awerbuch. Dr. Awerbuch said that if the money was intended for Dr. Awerbuch, it was "an insult." UC5 put the money back in his/her pocket and proceeded to inform Dr. Awerbuch that he/she sold some of his/her previously prescribed pills to co-workers. Dr. Awerbuch stated that he wished UC5 had not told him that, and requested that UC5 tell Dr. Awerbuch that UC5 would not do it again. UC5 agreed. Dr. Awerbuch advised that if UC5 sold pills and there was an overdose, they could both go to jail. Dr. Awerbuch prepared to end the visit, but asked UC5 if he/she worked with the "DEA" or "FBI." UC5 denied it. UC5 provided a urine sample. Dr. Awerbuch did not rescind the Vicodin prescription, but issued it as UC5 had requested.

    a. BCBSM paid Dr. Awerbuch a total of $73.64 for the following procedure billed for services provided to UC5 on this date:

| DOS | CPT | CPT DESCRIPTION | PAID |
|---|---|---|---|
| 9/13/2012 | 99213 | Office/Outpatient Visit, Est. Patient | $73.64 |

**January 25, 2013**

47. UC5 went to Dr. Awerbuch's office for a scheduled visit. UC5 reported to Dr. Awerbuch a pain level of "3" on a scale of 1 to 10, with pain spiking to a "4" at times. Dr. Awerbuch asked how the Vicodin was working for UC5, and UC5 said it seemed ok, but asked for Oxycontin, a Schedule II controlled substance. Dr. Awerbuch informed UC5 that Oxycontin is highly addictive and Dr. Awerbuch would not recommend it for UC5. Dr. Awerbuch informed UC5 there was a new drug available called Subsys that UC5 could utilize when the pain is bad. Dr. Awerbuch informed UC5 that he would provide a coupon so the first 30 doses of Subsys would be free. UC5 has never been diagnosed with cancer, and did not represent to Dr. Awerbuch that he/she had been diagnosed with cancer nor did he/she report severe pain. Dr. Awerbuch performed a brief physical examination, and remarked upon UC5's flexibility.

**May 23, 2013**

48. UC5 went to Dr. Awerbuch's office for a scheduled visit. UC5 informed Dr. Awerbuch that UC5 had contacted Dr. Awerbuch's prescription refill number requesting the Subsys be refilled at 200 mg. UC5 informed Dr. Awerbuch that the pharmacist had mentioned raising the dosage level of Subsys to increase UC5's tolerance. Dr. Awerbuch informed UC5 there was not a 300 mcg dosage of Subsys available and that he would be continuing the dosage of 200 mcg of Subsys, but would consider upping the dosage in the future. Dr. Awerbuch took UC5's blood pressure, had UC5 twist his/her torso, touch toes, and lift arms. Dr. Awerbuch stated that UC5 appeared to be very flexible and possess good strength. The entire exchange with Dr. Awerbuch lasted approximately five minutes. Dr. Awerbuch did not ask UC5 any questions about his/her pain level.

a. BCBSM paid Dr. Awerbuch a total of $68.64 for the following procedure billed for services provided to UC5 on this date:

| DOS | CPT | CPT DESCRIPTION | PAID |
|---------|-------|-------------------------------------|---------|
| 5/23/13 | 99213 | Office/Outpatient Visit, Est. Patient | $68.64 |

## B. Physician Reviews

49. An neurologist specializing in electrodiagnostic testing and disorders of the muscles, peripheral nerves and spinal cord conducted a review of several undercover visits that occurred pertaining to purported EMG and NCS testing. Among other things, the neurologist noted that the taped undercover visits which took place on April 19, 2011 and July 29, 2011 indicated that each study lasted less than two minutes per patient. Normal NCS/EMG testing would take approximately 20-90 minutes. No ground electrodes were placed on either patient nor were tape measurements taken; therefore an NCS result could not have been properly calculated. The neurologist further did not hear EMG muscle interference noise, muscle contraction, or motor recruitment. It did not appear that a needle attached to an EMG machine had pierced the skin of the undercover agents. The neurologist stated that the procedures set forth in CPT codes 95903, 95904, and 95934 were not performed on these occasions, and any claims submitted billing for such codes would be improper billing.

50. A physician review of UC5's undercover visits, focusing on the prescription of controlled substances, has also been conducted. Among other things, the physician noted the following: "There are two extremely troubling areas from the point of view of prescription medication management. The first occurs September 13, 2012 when UC5 admitted to Dr. Awerbuch that he/she had been diverting and selling medications that were prescribed to him/her. The outcome of this was simply that he/she was told 'not to do it again.' There was no effort

after that to document that UC5 was actually taking the medication, no pill counts, and no follow up whatsoever. In addition, UC5 as a patient appeared to attempt to bribe Dr. Awerbuch for additional medication, which was a strong indicator that this was not a normal patient physician relationship, that the medications were not being used to treat pain, and the prescriptions should immediately have been discontinued. There was no effort whatsoever made to do this. There was no follow up." The physician went on to state that the prescription of sublingual fentanyl (Subsys) to UC5 was aberrant, and "well outside the standard of care of practice of this physician." The physician further noted that UC5's request for Oxycontin "should also have been seen as a red flag for an attempt at diversion or abuse."

## C. Medicare Beneficiaries

51. Multiple Medicare beneficiaries were interviewed by the affiant and/or a Special Agent from the Federal Bureau of Investigation in 2014. The beneficiaries were among those patients who had purportedly received needle EMG and nerve conduction testing and/or Subsys prescriptions that were billed to Medicare.

52. R.D. is a Medicare beneficiary that is physically disabled due to a prior back injury and continuing back pain. R.D. suffered three herniated discs (L3, L4, L5, and S1) in 1997 and began seeing Dr. Awerbuch in 1998. Dr. Awerbuch tests the nerves in R.D.'s legs and claims there is a lot of nerve damage. Dr. Awerbuch places wires on R.D.'s legs and runs electricity through them for approximately five minutes. R.D. pulls up his/her pant legs up to the knees and wires are stuck onto the lower leg. Dr. Awerbuch watches a meter and at times has written things down. A small jolt is felt through the leg but it is not painful. R.D. can barely feel anything which is why Dr. Awerbuch says the nerve damage has gotten real bad. The actual visits with Dr. Awerbuch last

approximately ten minutes but on occasion are longer. R.D. has undergone numerous forms of testing at Dr. Awerbuch's office but does not ever recall receiving a needle EMG or being stuck with a needle other than cortisone injections.

a. Dr. Awerbuch billed Medicare Part B a total of $23,460 for services provided to R.D. for dates of service 1/26/09 to 11/21/13. The following table illustrates the total for the procedure codes at issue in the investigation:

| CPT | CPT DESCRIPTION | CT | BILLED | PAID |
|---|---|---|---|---|
| 95861 | Needle measurement and recording of electrical activity of muscles of arms or legs | 4 | $ 1,280.00 | $369.26 |
| 95886 | Needle measurement and recording of electrical activity of muscles of arm or leg complete study | 2 | $ 1,000.00 | $260.32 |
| 95903 | Nerve conduction, amplitude and latency/velocity study, each nerve; motor, with f-wave study | 2 | $ 600.00 | $394.82 |
| 95904 | Nerve conduction, amplitude and latency/velocity study, each nerve; sensory | 5 | $ 2,300.00 | $950.23 |

53. J.Y. is a Medicare beneficiary who first visited Dr. Awerbuch in September 2013 for pain management and testing. J.Y. stated that he/she will be going back to Dr. Awerbuch in the future but did not provide any scheduled dates. J.Y. stated that he/she has never had anything stuck into the skin, there were no injections administered, nor were any types of needles utilized. There was nothing painful about the visit with Dr. Awerbuch.

a. Dr. Awerbuch billed Medicare Part B a total of $1,650 for services provided to J.Y. for dates of service 9/24/13 to 10/15/13. The following

table illustrates the total for the procedure codes at issue in the investigation:

| CPT | CPT DESCRIPTION | CT | BILLED | PAID |
|-------|------------------------------------------------------------------------------------------|----|-----------|-----------|
| 95886 | Needle measurement and recording of electrical activity of muscles of arm or leg complete study | 1 | $   500.00 | $   125.72 |

54. D.G. is a Medicare beneficiary that began seeing Dr. Awerbuch in approximately 2008-09. D.G. suffered a back injury in his/her workplace. Diagnostic testing at Dr. Awerbuch's office is provided quarterly. D.G. described the EMG procedure as Dr. Awerbuch placing a needle on the surface of the skin in different areas with the test lasting a couple of minutes. Dr. Awerbuch works on a computer during the test. D.G. stated on one occasion he/she had a more intense test conducted at Dr. Awerbuch's office but the test was performed by a technician approximately one to two years earlier. EMG was described by D.G.'s spouse, also a Medicare beneficiary, as Dr. Awerbuch poking a needle just into the surface of the skin, approximately one layer of skin, and experiencing tingling. D.G.'s spouse stated the procedure is not painful and only lasts approximately one minute. D.G. waits a few hours to see Dr. Awerbuch at his office and combined with D.G's spouse spends approximately one hour actually receiving services. D.G. spent eight days in detox at McClaren Oakland in Pontiac, MI in the beginning of February 2014. After detox, D.G. checked into a rehabilitation center in New Baltimore, MI and checked him/herself out after two days. D.G.'s spouse stated that Dr. Awerbuch is the physician that continually fed D.G. pain medications that led to D.G checking his/herself into a detox program. At the time of the interview,

D.G. had not notified Dr. Awerbuch that he/she had been through detox. At the time of the interview D.G. was looking for an outpatient rehabilitation center to continue drug treatment. Prior to D.G. entering into detox, D.G. was utilizing a fentanyl patch as well as fentanyl spray called Subsys prescribed by Dr. Awerbuch. Dr. Awerbuch told D.G. that Subsys was something new to manage pain. D.G. utilized the Subsys at the same time as the fentanyl patches. D.G.'s spouse described the Subsys as too much for D.G. which made him/her incoherent and unable to function.  D.G. does not have cancer or any breakthrough cancer pain.

    a. Dr. Awerbuch billed Medicare Part B a total of $69,395 for services provided to D.G. for dates of service 5/2/11 to 11/9/13. The following table illustrates the total for the procedure codes at issue in the investigation:

| CPT | CPT DESCRIPTION | CT | BILLED | PAID |
|---|---|---|---|---|
| 95861 | Needle measurement and recording of electrical activity of muscles of arms or legs | 3 | $ 960.00 | $ 208.03 |
| 95886 | Needle measurement and recording of electrical activity of muscles of arm or leg complete study | 2 | $ 1,000.00 | $ 257.75 |
| 95903 | Nerve conduction, amplitude and latency/velocity study, each nerve; motor, with f-wave study | 1 | $ 400.00 | $ 217.09 |
| 95904 | Nerve conduction, amplitude and latency/velocity study, each nerve; sensory | 4 | $ 1,800.00 | $ 585.58 |

    b. Below is a summary of Medicare Part D claims data for Subsys Prescribed by Dr. Awerbuch for D.G.:

| DATE | NDC | DESCRIPTION | | DEA CLASS | DAYS | PAID |
|------|-----|-------------|---|-----------|------|------|
| 5/8/2013 | 20482000230 | SUBSYS | SPR 200MCG | C-II | 30 | $    860.57 |
| 6/5/2013 | 20482000230 | SUBSYS | SPR 200MCG | C-II | 30 | $  4,166.40 |
| 6/27/2013 | 20482000230 | SUBSYS | SPR 200MCG | C-II | 30 | $  4,166.40 |
| 7/27/2013 | 20482000230 | SUBSYS | SPR 200MCG | C-II | 30 | $  1,063.09 |
| 9/3/2013 | 20482000230 | SUBSYS | SPR 200MCG | C-II | 30 | $  4,162.45 |
| 9/19/2013 | 20482000430 | SUBSYS | SPR 400MCG | C-II | 30 | $  6,042.69 |
| 10/18/2013 | 20482000230 | SUBSYS | SPR 200MCG | C-II | 30 | $  2,081.92 |
| 10/22/2013 | 20482000430 | SUBSYS | SPR 400MCG | C-II | 30 | $  6,042.69 |
|  |  |  |  |  |  | $ 28,586.21 |

55. A.M. is a Medicare beneficiary that became eligible for coverage after suffering a back injury approximately 19 years prior to being interviewed. A.M. began seeing Dr. Awerbuch approximately 1.5 to 2 years after being referred by a family physician. A.M. sees Dr. Awerbuch every 2-3 months with visits typically lasting approximately 15-20 minutes or at times 30 minutes or longer if there are any issues to talk about. A.M. has had a lot of testing performed by multiple doctors involving the utilization of needles. A.M. described testing performed by Dr. Awerbuch that involved being poked by a needle to test the nerves. A.M. is not sure why the tests are performed but stated they are not done often because they are uncomfortable. The testing only lasts a couple of minutes and does not result in bleeding. Dr. Awerbuch lowered the amount of short term pain medications (Dilaudid) prescribed to A.M. and switched to a drug called Subsys. A.M. utilizes the Subsys four times per day. A.M. has utilized fentanyl on and off for the past ten years and currently utilizes a

fentanyl patch in conjunction with the Subsys. A.M. does not have cancer or breakthrough pain associated with cancer.

    a. Dr. Awerbuch billed Medicare Part B a total of $18,600 for services provided to A.M. for dates of service 1/8/13 to 10/17/13. The following table illustrates the total for the procedure codes at issue in the investigation:

| CPT | CPT DESCRIPTION | CT | BILLED | PAID |
|---|---|---|---|---|
| 95886 | Needle measurement and recording of electrical activity of muscles of arm or leg complete study | 3 | $ 1,500.00 | $ 256.58 |

    b. Below is a summary of Medicare Part D claims data for Subsys Prescribed by Dr. Awerbuch for A.M.:

| DATE | NDC | DESCRIPTION | | DEA CLASS | DAYS | PAID |
|---|---|---|---|---|---|---|
| 3/21/2013 | 20482000230 | SUBSYS | SPR 200MCG | C-II | 30 | $ 525.71 |
| 4/19/2013 | 20482000630 | SUBSYS | SPR 600MCG | C-II | 30 | $ 7,776.78 |
| 5/22/2013 | 20482000630 | SUBSYS | SPR 600MCG | C-II | 30 | $ 7,776.78 |
| 6/5/2013 | 20482000230 | SUBSYS | SPR 200MCG | C-II | 30 | $ 4,351.57 |
| 8/14/2013 | 20482000230 | SUBSYS | SPR 200MCG | C-II | 30 | $ 4,351.57 |
| 9/10/2013 | 20482000630 | SUBSYS | SPR 600MCG | C-II | 30 | $ 7,759.45 |
| 10/14/2013 | 20482000630 | SUBSYS | SPR 600MCG | C-II | 30 | $ 7,759.45 |
| 11/11/2013 | 20482000230 | SUBSYS | SPR 200MCG | C-II | 30 | $ 4,117.15 |
| 12/9/2013 | 20482000230 | SUBSYS | SPR 200MCG | C-II | 30 | $ 4,117.15 |
| 12/18/2013 | 20482000630 | SUBSYS | SPR 600MCG | C-II | 30 | $ 8,198.83 |
| 1/6/2014 | 20482000630 | SUBSYS | SPR 600MCG | C-II | 30 | $ 5,238.13 |
| | | | | | | $ 61,972.57 |

56. K.C. is a Medicare beneficiary that previously received services from Dr. Awerbuch. K.C. had reviewed an Explanation of Benefits (EOB) received from

Medicare and was "blown away" by the amount of money associated with the charges submitted by Dr. Awerbuch. K.C. recalled seeing how much the Fentanyl spray Subsys cost and being shocked. K.C. stated he/she is in a lot of pain but after seeing Subsys costing approximately $7k per month stated "come on". K.C. reviewed testing identified on the EOBs and stated "I don't know what kind of testing is done" at Dr. Awerbuch's office. K.C. is diagnosed with Reflex Sympathetic Dystrophy (RSD), Rheumatoid Arthritis (RA), and is seeing an Oncologist for pre-cancerous cells. K.C. has been advised there is a high possibility that he/she will be diagnosed with cancer at some point but had not been diagnosed with cancer at the time of the interview. K.C. went to Dr. Awerbuch's office for prescriptions only once per month and has office visits every three months. K.C.'s child K.J. was also a patient of Dr. Awerbuch. K.J. began seeing Dr. Awerbuch due to migraines and was diagnosed by Dr. Awerbuch to have Fibromyalgia. K.J. has also been diagnosed with Rheumatoid Arthritis. Dr. Awerbuch knows that K.C. has pinched nerves but still does the same type of tests at the recurring visits. Face to face time with Dr. Awerbuch is on average 10-15 minutes but K.C. has waited up to four hours to see Dr. Awerbuch. K.C. previously had undergone neurological testing as a patient at the University of Michigan (U of M) and stated testing lasted a lot longer and was more extensive than the couple of pokes Dr. Awerbuch administers. Testing at U of M was painful when poked in certain spots and was way different than the testing performed by Dr. Awerbuch. Dr. Awerbuch requires testing be completed at each three month visit. The required testing includes a needle and is conducted at "pretty much" every visit. K.J. was previously a BCBSM beneficiary and stated that he/she is unsure if the needle is even hooked up to a machine when Dr. Awerbuch performs EMG testing. K.J. described Dr. Awerbuch's testing as a "generic version" comparing it to a "real

doctor" who would utilize equipment that had computer screens/printouts etc. There are no noises heard from the machine and nothing is printed during the testing. K.J. stated sometimes there will be a brief burning and Dr. Awerbuch will say that means carpal tunnel. K.C. and K.J. both described the testing as "literally" lasting seconds and indicated the needle does not penetrate the skin and only touches the arm two times. K.C. has never been asked to contract a muscle during the testing. K.C. stated the only thing ever done is one or two pokes with a needle. K.J. reiterated the testing does not involve any intrusion into the skin. Dr. Awerbuch prescribed Subsys to K.C. for approximately five months. Dr. Awerbuch told K.C. that K.C. "would really like this" when prescribing Subsys. K.C. stopped filling the prescriptions for Subsys after discovering the cost of the product. When K.C. informed Dr. Awerbuch he/she no longer wanted the Subsys he asked K.C. if he/she wanted him to increase the dosage. K.C. declined and did not like taking Subsys. K.C. was prescribed four doses a day of Subsys. K.C. discarded approximately four months' worth of unused Subsys because there were kids in the house and the medication is not easy to store. K.C. takes Oxycontin as prescribed and all other medications make K.C. feel "drugged". K.C. recalls a young woman at Dr. Awerbuch's office called K.C.'s Oncologist to verify K.C. had pre-cancerous cells because K.C. had to be pre-cancerous in order to receive Subsys.

    a. Dr. Awerbuch billed Medicare Part B a total of $23,014 for services provided to K.C. for dates of service 8/7/09 to 10/30/13. The following table illustrates the total for the procedure codes at issue in the investigation:

| CPT | CPT DESCRIPTION | CT | BILLED | PAID |
|---|---|---|---|---|
| 95861 | Needle measurement and recording of electrical activity of muscles of arms or legs | 8 | $ 2,560.00 | $ 684.01 |
| 95886 | Needle measurement and recording of electrical activity of muscles of arm or leg complete study | 4 | $ 2,000.00 | $ 260.32 |
| 95903 | Nerve conduction, amplitude and latency/velocity study, each nerve; motor, with f-wave study | 6 | $ 2,400.00 | $ 1,212.42 |
| 95904 | Nerve conduction, amplitude and latency/velocity study, each nerve; sensory | 9 | $ 5,209.00 | $ 1,707.71 |

b. Below is a summary of Medicare Part D claims data for Subsys Prescribed by Dr. Awerbuch for K.C.:

| DATE | NDC | DESCRIPTION | | DEA CLASS | DAYS | PAID |
|---|---|---|---|---|---|---|
| 4/17/2013 | 20482000230 | SUBSYS | SPR 200MCG | C-II | 30 | $ 4,166.40 |
| 5/17/2013 | 20482000230 | SUBSYS | SPR 200MCG | C-II | 30 | $ 4,166.40 |
| 6/18/2013 | 20482000230 | SUBSYS | SPR 200MCG | C-II | 30 | $ 4,166.40 |
| 7/18/2013 | 20482000230 | SUBSYS | SPR 200MCG | C-II | 30 | $ 4,166.40 |
| 8/19/2013 | 20482000230 | SUBSYS | SPR 200MCG | C-II | 30 | $ 4,166.40 |
| 9/19/2013 | 20482000230 | SUBSYS | SPR 200MCG | C-II | 30 | $ 4,166.40 |
| 10/22/2013 | 20482000230 | SUBSYS | SPR 200MCG | C-II | 30 | $ 4,166.40 |
| | | | | | | $ 29,164.80 |

57. K.S. is a Medicare beneficiary that was involved in a car accident in October 2012 and learned of Dr. Awerbuch through K.S.'s mother. K.S. has

fibromyalgia, Hashimoto's thyroiditis, and degenerative discs in the back. K.S. sees Dr. Awerbuch every three months and estimates waiting an hour to see Dr. Awerbuch, and spends about 20 to 30 minutes seeing Dr. Awerbuch. Dr. Awerbuch diagnosed K.S. with carpel tunnel via an EMG test. K.S. advised the EMG lasted approximately five to ten minutes and consisted of a pen attached to a wire that shocked him/her. The EMG did not cause bleeding or pain. The EMG is rendered on K.S.'s feet which according to K.S. were numb. K.S. is prescribed Norco and Subsys by Dr. Awerbuch. Subsys is prescribed to K.S. once per month is only utilized when K.S. is hurting real bad. At the time of the interview K.S. was supposed to be stopping the Norco soon. K.S. researched Subsys and learned it was for cancer patients and was a threat to children. K.S. does not have cancer.  Dr. Awerbuch started prescribing K.S. Subsys approximately five months prior to the interview. K.S. had not used fentanyl prior to Subsys.

    a. Dr. Awerbuch billed Medicare Part B a total of $12,530 for services provided to K.S. for dates of service 6/11/13 to 12/17/13. The following table illustrates the total for the procedure codes at issue in the investigation:

| CPT | CPT DESCRIPTION | CT | BILLED | PAID |
|---|---|---|---|---|
| 95886 | Needle measurement and recording of electrical activity of muscles of arm or leg complete study | 3 | $ 1,500.00 | $ 251.44 |

    b. Below is a summary of Medicare Part D claims data for Subsys Prescribed by Dr. Awerbuch for K.S.:

| DATE | NDC | DESCRIPTION | | DEA CLASS | DAYS | PAID |
|---|---|---|---|---|---|---|
| 10/1/2013 | 20482000230 | SUBSYS | SPR 200MCG | C-II | 30 | $ 195.45 |
| 10/30/2013 | 20482000230 | SUBSYS | SPR 200MCG | C-II | 30 | $ 797.23 |

| 11/12/2013 | 20482000430 | SUBSYS | SPR 400MCG | C-II | 30 | $ 2,942.81 |
| 12/9/2013 | 20482000630 | SUBSYS | SPR 600MCG | C-II | 15 | $ 1,910.78 |
| 12/21/2013 | 20482000630 | SUBSYS | SPR 600MCG | C-II | 30 | $ 3,820.61 |
| 1/15/2014 | 20482000630 | SUBSYS | SPR 600MCG | C-II | 30 | $ 4,463.01 |
| | | | | | | $ 14,129.89 |

58. A.Z. is a Medicare beneficiary that has been seeing Dr. Awerbuch for chronic pain/headaches for approximately five years. Visits with Dr. Awerbuch are every three months and consist of A.Z. discussing pain progression with Dr. Awerbuch and diagnostic tests. Testing has included A.Z. placing his/her hands on a machine that informs Dr. Awerbuch of A.Z.'s carpal tunnel progression. The test lasts a couple of seconds. Dr. Awerbuch tests the nerves in A.Z.'s back and legs but none of the testing at Dr. Awerbuch's office involves a needle except for injections received in the knee. A.Z. is prescribed Oxycontin and Subsys. A.Z. was prescribed Subsys approximately four months prior to the interview and takes the Subsys three or four times a day depending upon pain level. A.Z. was asked if he/she was diagnosed with cancer and A.Z. replied no. A.Z. has been told he/she has pre-cancerous cells but has never been diagnosed with cancer.

    a. Dr. Awerbuch billed Medicare Part B a total of $34,895 for services provided to A.Z. for dates of service 12/8/09 to 1/11/13. The following table illustrates the total for the procedure codes at issue in the investigation:

| CPT | CPT DESCRIPTION | CT | BILLED | PAID |
|---|---|---|---|---|
| 95861 | Needle measurement and recording of electrical activity of muscles of arms or legs | 3 | $ 960.00 | $ 281.03 |
| 95886 | Needle measurement and recording of electrical activity of muscles of arm or leg complete study | 1 | $ 500.00 | $ 132.03 |

| 95903 | Nerve conduction, amplitude and latency/velocity study, each nerve; motor, with f-wave study | 3 | $ 950.00 | $ 487.82 |
| 95904 | Nerve conduction, amplitude and latency/velocity study, each nerve; sensory | 4 | $ 1,825.00 | $ 718.33 |

b. Below is a summary of Medicare Part D claims data for Subsys Prescribed by Dr. Awerbuch for A.Z.:

| DATE | NDC | DESCRIPTION | | DEA CLASS | DAYS | PAID |
|---|---|---|---|---|---|---|
| 3/22/2013 | 20482000230 | SUBSYS | SPR 200MCG | C-II | 30 | $ 463.61 |
| 4/22/2013 | 20482000230 | SUBSYS | SPR 200MCG | C-II | 30 | $ 1,967.15 |
| 5/20/2013 | 20482000230 | SUBSYS | SPR 200MCG | C-II | 30 | $ 1,961.07 |
| 6/17/2013 | 20482000230 | SUBSYS | SPR 200MCG | C-II | 30 | $ 1,961.07 |
| 7/13/2013 | 20482000230 | SUBSYS | SPR 200MCG | C-II | 30 | $ 1,961.07 |
| 7/17/2013 | 20482000430 | SUBSYS | SPR 400MCG | C-II | 30 | $ 2,846.68 |
| 8/6/2013 | 20482000630 | SUBSYS | SPR 600MCG | C-II | 30 | $ 7,390.36 |
| 8/27/2013 | 20482000430 | SUBSYS | SPR 400MCG | C-II | 30 | $ 5,692.24 |
| 9/24/2013 | 20482000430 | SUBSYS | SPR 400MCG | C-II | 30 | $ 5,692.24 |
| 10/3/2013 | 20482000630 | SUBSYS | SPR 600MCG | C-II | 30 | $ 7,390.36 |
| 10/21/2013 | 20482000430 | SUBSYS | SPR 400MCG | C-II | 30 | $ 5,692.24 |
| 10/30/2013 | 20482000630 | SUBSYS | SPR 600MCG | C-II | 30 | $ 7,390.36 |
| 11/18/2013 | 20482000430 | SUBSYS | SPR 400MCG | C-II | 30 | $ 5,692.24 |
| 11/25/2013 | 20482000630 | SUBSYS | SPR 600MCG | C-II | 30 | $ 3,695.75 |
| 12/19/2013 | 20482000430 | SUBSYS | SPR 400MCG | C-II | 30 | $ 2,846.68 |
| 12/21/2013 | 20482000630 | SUBSYS | SPR 600MCG | C-II | 30 | $ 3,695.75 |
| 1/16/2014 | 20482000630 | SUBSYS | SPR 600MCG | C-II | 30 | $ 4,627.54 |
| | | | | | | $ 70,966.41 |

## D. Ex-Employee Interview

59. A former employee, employed with Awerbuch from approximately April 2011 until January 2014, stated that Dr. Awerbuch works four days per week at his

office located at 5889 Bay Road, Saginaw, MI and sees approximately 40-60 patients per day. The former employee stated that Dr. Awerbuch does not do thorough examinations and spends approximately ten minutes with each patient. The former employee stated that insurance companies are billed for diagnostic testing that Dr. Awerbuch does not perform. The former employee is aware of the fact that diagnostic testing is not performed because he/she has questioned patients who have informed him/her they had not received the testing. The former employee has observed patients tell Dr. Awerbuch which types of controlled substances they want him to prescribe. The former employee is aware there are patients that test negative for narcotics prescribed by Dr. Awerbuch, indicating that the patients are not taking their prescribed pills. Dr. Awerbuch has nonetheless prescribed the pills and issued refills.

**E. Independent Neurologist Interview**

60. W.B., a Neurologist in the State of Michigan, has on occasion been hired as an Independent Neurologist by insurers to review Dr. Awerbuch's testing performed on workman's compensation clients. WB has reviewed hundreds of Dr. Awerbuch's patient charts and interviewed patients of Dr. Awerbuch. W.B. has repeated EMG testing on many of Dr. Awerbuch's patients and rarely have the results been the same as Dr. Awerbuch's. WB has no doubt that Dr. Awerbuch has fabricated EMG test results in order to justify diagnoses for such patients.

**F. Claims Data**

61. Dr. Awerbuch is the most prolific prescriber of Subsys in the nation for Medicare beneficiaries, by a wide margin. The below chart reflects a Medicare Part D Peer Comparison report ranking Prescribers of Subsys nationwide and in the State of Michigan, based on the amount paid by Medicare Part D for the prescriptions. Below is a table illustrating the top 10 Subsys prescribers

nationwide in the Medicare Part D Program, ranked by the total paid by Part D
plans, the government, beneficiary, and other parties:

| PRESCRIBER ID | PRESCRIBER NAME | STATE | PAID | # OF PDE RECORDS |
|---|---|---|---|---|
| **1811984487** | **GAVIN I AWERBUCH** | **MI** | **$6,969,100.33** | **1,283** |
| xxxxxxxx06 | "REDACTED" | TX | $1,615,254.04 | 84 |
| xxxxxxxx01 | "REDACTED" | AL | $1,021,211.97 | 145 |
| xxxxxxxx70 | "REDACTED" | NH | $977,256.83 | 99 |
| xxxxxxxx74 | "REDACTED" | AL | $859,511.13 | 203 |
| xxxxxxxx06 | "REDACTED" | FL | $814,063.78 | 89 |
| xxxxxxxx25 | "REDACTED" | TN | $708,379.63 | 74 |
| xxxxxxxx78 | "REDACTED" | NY | $640,993.15 | 71 |
| xxxxxxxx91 | "REDACTED" | FL | $629,099.55 | 49 |
| xxxxxxxx63 | "REDACTED" | RI | $614,022.98 | 123 |

62. Below is a table illustrating the Prescribers of Subsys in the State of Michigan
ranked by the total paid by plans, government, beneficiary, and other parties:

| PRESCRIBER ID | PRESCRIBER NAME | STATE | PAID | # OF PDE RECORDS |
|---|---|---|---|---|
| **1811984487** | **GAVIN I AWERBUCH** | **MI** | **$6,969,100.33** | **1,283** |
| xxxxxxxx03 | "REDACTED" | MI | $165,024.40 | 27 |
| xxxxxxxx06 | "REDACTED" | MI | $162,289.92 | 33 |
| xxxxxxxx19 | "REDACTED" | MI | $77,287.64 | 30 |
| xxxxxxxx34 | "REDACTED" | MI | $72,861.06 | 9 |
| xxxxxxxx70 | "REDACTED" | MI | $41,606.19 | 7 |
| xxxxxxxx95 | "REDACTED" | MI | $23,891.72 | 6 |
| xxxxxxxx32 | "REDACTED" | MI | $4,378.02 | 1 |
| xxxxxxxx28 | "REDACTED" | MI | $4,292.46 | 1 |
| xxxxxxxx47 | "REDACTED" | MI | $2,417.35 | 3 |
| xxxxxxxx52 | "REDACTED" | MI | $286.55 | 1 |
| xxxxxxxx71 | "REDACTED" | MI | $144.07 | 1 |

63. As is clear from the two charts above, Dr. Awerbuch's prescriptions for Subsys
have cost the Medicare program nearly $7 million during the time frame

January 2009 to February 2014, with his closest competitor having prescribed only $1,615,254 of this medication for Medicare beneficiaries. Dr. Awerbuch is responsible for approximately 20.3% of the Subsys prescribed to Medicare beneficiaries nationwide during this time frame.

64. Dr. Awerbuch is also one of the leading billers of Medicare for needle EMGs and NCS nationwide. A nationwide Medicare peer comparison, depicted below, shows where Awerbuch ranks among Neurologists and all practitioners, both nationwide and in the state of Michigan, with respect to the needle EMG codes and NCS codes at issue in this investigation:

| CPT | NEUROLOGY SPECIALTY RANK - NATIONWIDE | ALL SPECIALTIES RANK - MICHIGAN | ALL SPECIALTIES RANK - NATIONWIDE |
|---|---|---|---|
| 95861 | 2 | 1 | 2 |
| 95864 | 2 | 1 | 2 |
| 95885 | 503 | 27 | 671 |
| 95886 | 3 | 2 | 5 |
| 95887 | 1313 | 78 | 1422 |
| 95903 | 1 | 1 | 2 |
| 95904 | 1 | 1 | 1 |

65. As this chart depicts, Dr. Awerbuch is among the nation's leaders in five of the seven codes listed. Dr. Awerbuch has reaped more than $5.6 million for such testing since January 2009, including approximately $464,591 from Medicare since January 2012.

66. Pursuant to Title 21 U.S.C. 841(a)(1), a physician illegally distributes controlled substances when he or she prescribes controlled substances other than in good faith in the usual course of professional practice and in accordance with a standard of medical practice generally recognized and accepted in the United States.

67. Pursuant 18 U.S.C. § 1347, a person commits federal health care fraud by executing a scheme or artifice to defraud any health care benefit program.

68. Based on the information described above, there is a reasonable belief that a significant portion of Dr. Awerbuch's business is derived from fraudulent or fictitious billing.

69. As discussed more fully above, the facts developed to date indicate that the procedures Dr. Awerbuch is performing do not constitute nerve conduction studies or needle EMGs, and that his prescriptions for Subsys are prescribed other than in good faith outside the scope of usual professional practice. There is probable cause to believe, therefore, that Dr. Awerbuch is defrauding Medicare by billing for nerve conduction studies and needle EMGs that he is not performing, and is prescribing the controlled substance Subsys illegally. Given the evidence developed the undercover patient visits, the patient interviews, and the total monies received from Medicare and other insurers, there is also probable cause that Dr. Awerbuch's fraudulent and illegal conduct is pervasive.

\*\*\*

70. Based upon your affiant's training and experience and the facts presented herein, your Affiant respectfully submits there is probable cause to believe, Gavin Ira Awerbuch has violated 18 U.S.C. § 1347 (Health Care Fraud) and 21 U.S.C. § 841 (Controlled Substance Distribution).

71. As such, your Affiant respectfully requests that an arrest warrant be issued for Gavin Ira Awerbuch.

Marc L. Heggemeyer
Special Agent
U. S. Department of Health and Human Services
Office of Inspector General
Office of Investigations

Sworn and subscribed to before me

this _2nd_ day of May, 2014.

United States Magistrate Judge
Detroit, Michigan